**UNITED STATES of America,**

v.

**Kian GOHARI, Defendant.**

16–cr–246–03 (JSR)

United States District Court,
S.D. New York.

Signed January 4, 2017

Derrelle Marcel Janey, Gottlieb & Godon LLP, Robert Curtis Gottlieb, Law Offices of Robert C. Gottlieb, New York, NY, for Defendant.

### MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

On November 9, 2016, following an eight-day trial, a jury found defendant Kian Gohari guilty of one count of conspiracy to distribute a controlled substance and one count of conspiracy to commit healthcare fraud. See Transcript ("Tr.") dated November 9, 2016, ECF No. 104, at 994–995. In brief, the Government set forth evidence that defendant, a licensed pharmacist, conspired with Gilberto Cabrera and others to dispense medically unnecessary oxycodone pills that Cabrera and his cronies could then unlawfully distribute. In return, Cabrera brought to the defendant prescriptions for "high end" medications that were financially lucrative for defendant's pharmacy to fill. In furtherance of the agreement, from 2012 to 2015, Cabrera regularly brought to the defendant's pharmacy medically unnecessary oxycodone prescriptions for over a dozen patients and from an array of doctors, depending on which doctor was known in the neighborhood to be "writing" prescriptions for oxycodone at that time.

■ Defendant now moves for a new trial under Federal Rule of Criminal Procedure 33, which states that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." "The test is whether 'it would be a manifest injustice to let the guilty verdict stand.'"

United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). Defendant makes two arguments in support of his motion.

First, defendant argues that the Court should have stricken the testimony of the Government's cooperating witness, Cabrera, as "patently incredible." In particular, defendant claims that Cabrera's account of the conspiracy was contradicted by the testimony of the Government's expert witness, William Winsley, and the defense's summary witness, Ronald Quintero, and that his testimony was internally inconsistent.

■ In evaluating the merits of a motion for a new trial, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Olazabal, 610 Fed.Appx. 34, 37 (2d Cir. 2015) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir.1992)). Here, the Government introduced substantial evidence corroborating Cabrera's account of the conspiracy,[1] his interactions with the defendant,[2] and defendant's illegal quid pro quo arrangement with the coconspirators.[3]

Defendant's arguments to the contrary do not render Cabrera's testimony patently incredible. In particular, while defendant is correct that Mr. Winsley testified that it is good practice for a pharmacist to direct patients to bring all their prescriptions to one pharmacy, Tr. 554:24–555:4, it does not follow that defendant's "request for all of Cabrera's prescriptions evidenced only [defendant's] prudent pharmacy prac-

---

1. See Tr. (Sheri Bowen) 578:17–21; 595:11–17; id. (Sharon Auyeung) at 144:2–8; GX 403, 404 (wiretaps); GX 201–219 (pharmacy records).

2. Compare id. (Cabrera) at 253:15–24 with id. (Auyeung) at 143:8–16 and id. (Bowen) at 603:16–25.

3. Compare id. (Cabrera) at 128:15–24, 211:10–14, 234:2–9, 241:14–18, 297:9–14 with id. (Bowen) at 595:13–17, 602:7–15, 635:11–14, 636:7–9; id. (Auyeung) at 144:2–8, GX 201–219 (pharmacy records).

tice." See Defendant Kian Gohari's Mem. of Law in Support of His 33 Motion for a New Trial ("Def.'s Br.") at 5, ECF No. 87. The fact that there is one innocent explanation for defendant's behavior does not mean that defendant ipso facto acted for that reason. Given all the circumstances, the jury could quite reasonably conclude that defendant sought other prescriptions as a quid pro quo for his filling illegal prescriptions for oxycodone, rather than as a good faith pharmaceutical practice.

Similarly, while defendant is correct that the defense's summary witness, Mr. Quintero, testified that defendant, on average, earned relatively small annual sums from the scheme, see Tr. 772:16–18, the jury could reasonably conclude that this was sufficient financial incentive to participate in the conspiracy. This is particularly the case given that the prescriptions from the coconspirators comprised as much as 5 percent of the pharmacy's revenue in some years. See DX 84.

Lastly, defendant overstates the purported inconsistencies in Cabrera's testimony. As is often the case with witnesses testifying about events that occurred several years before trial, Cabrera's account of certain interactions was at times less than perfectly consistent. See Tr. 216:25–217:7, id. at 440:5–14; id. at 211:5–7, 391:25–392:4. But none of these inconsistencies was so material and inexplicable as to render Cabrera incredible as a matter of law. It is also true that Cabrera admitted that he at times lied to his coconspirators; but the Court does not agree with defendant's claim that this negates the existence of a conspiratorial scheme. See id. at 382:19–384:17; 385:9–23; id. at 624:2–20. As suggested by the age-old maxim "no honor among thieves," coconspirators may reach some basic agreements among themselves but also engage in self-interested lying to each other on other points. It is commonplace, for example, for coconspira-

tors to agree in principle to equally share proceeds of their illegal acts and yet, in practice, to try to cheat each other out of parts of the proceeds; but they are still guilty of having conspired to commit the illegal acts. The jury could readily have found here that all the conspirators agreed on the basic unlawful objects of the conspiracy. The Court therefore declines to strike Cabrera's testimony as patently incredible.

■ Defendant's second argument challenges the admission of testimony concerning Dr. Naveed Ahmad. Dr. Ahmad operated a medical office near defendant's pharmacy. In 2013, the Kings County District Attorney charged Dr. Ahmad with healthcare fraud based on allegations that he was knowingly writing prescriptions for HIV medications for patients who were not HIV positive (the "Ahmad conspiracy"). Dr. Ahmad pled guilty and was sentenced to probation. Prior to trial, the Court ruled that the Government could not introduce evidence related to the arrest and conviction of Dr. Ahmad, see id. 3:15–4:4, but deferred ruling on other evidence related to Dr. Ahmad, finding that, at minimum, it was relevant. Id. at 10:13–16; 13:17–22. In particular, as the Court stated, it was directly relevant to the Government's theory that the pay-off to defendant for filling Cabrera's illegal oxycodone prescriptions were lucrative HIV prescriptions that Cabrera directed from Ahmad to defendant.

Further to this ruling, the Court, at trial, allowed testimony, over defendant's objection, that (1) Dr. Ahmad gave out prescriptions for HIV medications to patients without running tests to determine whether the patients were in fact HIV positive, id. at 436:4–11; (2) that defendant recommended that Cabrera and other patients go to Dr. Ahmad for prescriptions, id. at 126:19–127:6; 257:18–25; (3) that the defendant met with Cabrera at Dr. Ah-

mad's office, where the defendant handed out business cards to those present, id. at 119:13–121:7; and (4) that in 2011 and 2012, prescriptions written by Dr. Ahmad generated approximately 70% of Gohari's Medicaid billings. Id. at 684:11–685:3. The Court explained that such evidence was relevant both as direct evidence of the payoff and also to proving defendant's lack of good faith (which the Government had to prove beyond a reasonable doubt), because it showed that defendant had reason to believe that the prescriptions that customers brought to him from Dr. Ahmad were medically unnecessary and that defendant had a motive for nonetheless filling the prescriptions without appropriate inquiry. Id. at 669:16–670:1.

The defendant first objects to the admission of this on the ground that Dr. Ahmad was not listed as a coconspirator in the charged conspiracy. But as the Court explained when this objection was raised at trial:

> [J]ust to take the most obvious example, people get together in conspiracies, and maybe they need an illegal gun, so they go off to a guy who they know will sell them an illegal gun, but it doesn't make the guy who they get the illegal gun from a member of the overall conspiracy, but it certainly is relevant that they went off and got an illegal gun rather than a legal one. And that's the sort of argument [the Government is] making with respect to Dr. Ahmad.

Id. at 658:17–24; 660:8–21. The Court also explained that such evidence corroborated the testimony of Cabrera, id. who had testified to various meetings between Cabrera and the defendant at and concerning Ahmad's office. Id. at 119:13–121:7; 126:19–127:6; 257:18–25.

■ Defendant further argues in the present motion (as he did at trial) that this is "impermissible propensity evidence" that could only be probative of defendant's participation in the charged conspiracy "if the jury assumed that [defendant]'s knowing participation in the Ahmad conspiracy in turn made it more likely that he engaged in the charged conspiracy." Def.'s Br. at 13. This, according to defendant, "is precisely the type of evidence that Federal Rule of Evidence 404(b) prohibits." Id.

■ Defendant is incorrect that the proffered testimony falls within Rule 404(b). It is well established in the Second Circuit that "[e]vidence of uncharged criminal conduct is not evidence of 'other crimes, wrongs, or acts' under Rule 404(b) if that conduct 'arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" United States v. Robinson, 702 F.3d 22, 36–37 (2d Cir. 2012) (quoting United States v. Carboni, 204 F.3d 39, 44 (2d Cir.2000)); see United States v. Romero–Padilla, 583 F.3d 126, 130 (2d Cir. 2009). The evidence here more than meets all three of these alternatives, any one of which is sufficient.[4]

The evidence further shows that defendant used what the defense terms the "Ahmad conspiracy" to further the illegal aims of the charged conspiracy, both by tapping Dr. Ahmad's patients as additional coconspirators and using his office to acquire further "high end" HIV prescriptions. See United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act

---

4. As noted, the testimony is also admissible as corroboration of Cabrera, whose credibility was under vigorous attack by the defense.

within the meaning of Rule 404(b); rather, it is part of the very act charged.").[5] Accordingly, the evidence concerning Dr. Ahmad is direct proof of the charged conspiracy falling outside the scope of Rule 404(b).

But even assuming, arguendo, that Rule 404(b) did govern the admissibility of the Ahmad evidence, the evidence would still be admissible under that rule. The rule states that evidence of crimes, wrongs, or other acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Here, the Ahmad evidence plainly bore on defendant's intent and knowledge, which defendant placed in question by asserting that he filled the prescriptions in good faith. See United States v. Williams, 526 Fed.Appx. 29, 35 (2d Cir. 2013) (trial court properly admitted evidence of the defendant's prior firearms conviction given his good faith defense at trial to charges of improper possession of a firearm).

 Defendant does not dispute that these are legitimate uses under ⋅ Rule 404(b)(2), but argues that the Government failed to give him proper notice under the rule. See transcript of oral argument on

defendant's Rule 33 motion dated December 21, 2016 ("Rule 33 Tr."). This argument is without merit. Rule 404(b)(2)(A) states that "[o]n request by a defendant in a criminal case," the Government must provide "reasonable notice" of the "general nature" of evidence of crimes, wrongs, or other acts. Contrary to defendant's assertion, however, there is no requirement that the Government recite the incantation "404(b)" in its disclosure. See Rule 33 Tr. 11:16–20.[6] Instead, the Government must provide "sufficient information to establish the relevance and probative value of the proffered testimony." See United States v. Canales, 718 F.Supp.2d 327, 329 (S.D.N.Y. 2010).

This the Government plainly did. For example, in its opposition to defendant's motion for a bill of particulars, dated July 19, 2016, the Government stated:

> [A]t the request of defense counsel, on July 8, 2016, the Government disclosed the names of eighteen individuals whose prescriptions it will offer evidence about at trial . . . . The Government also hereby discloses that more generally, at trial, the Government will offer evidence regarding fraudulently-obtained HIV drugs, which were prescribed by Dr.

---

**5.** This evidence also directly refutes defendant's argument that his request for prescriptions other than oxycodone was good faith pharmaceutical practice. Tr. 917:19–918:24. The evidence shows that defendant was overwhelmingly interested in filling prescriptions from Dr. Ahmad's office, which were primarily "high end" HIV medications. Id. at 682–684. This is direct evidence of the illegal quid pro quo that is the basis of the charged conspiracy. Moreover, defendant and Cabrera's joint participation in the Ahmad conspiracy is direct evidence that the two were coconspirators during the charged conspiracy. See Romero–Padilla, 583 F.3d at 130 (although evidence of defendant's previous plans with a coconspirator to import narcotics "did not concern the charged conspiracy, it was rele-

vant background evidence inasmuch as it corroborated the charge that [the coconspirator] and [defendant] were partners during the charged conspiracy").

**6.** Defendant's argument creates an untenable double standard. While defendant claims that the Government must use the phrase "404(b)" in its disclosure, defendant does not assert that he cited the rule in any of his discovery requests. The Court sees no reason to apply a different standard to the parties, given that Rule 404(b)(2)'s notice requirement is triggered only on "request by a defendant." Accordingly, even if the defendant were correct, his motion would still be denied for failure to give proper notice to the Government under 404(b)(2).

Naveed Ahmad and dispensed at AFAM.

ECF No. 41, at 3.[7] This disclosure, which was elaborated further, see id. at 7–11, is sufficient to establish the relevance and probative value of the Ahmad prescription data.

Further still, during a subsequent hearing held on August 4, 2016, the Government reiterated that it had produced distribution data related to Dr. Ahmad and that "the relevant subset" was "the prescriptions that were filled at this pharmacy." See Transcript dated August 4, 2016, ECF No. 50, at 14–15. Aside from this general patient data, the Government also stated that it had received specific patient files from the Brooklyn District Attorney's Office and would introduce the files of 20 coconspirators. Id. at 16. The Government introduced at trial precisely this mix of general patient data and specific patient files, and therefore complied with its notice obligations under Rule 404(b)(2).[8]

For the foregoing reasons, defendant's motion is denied in all respects. The Clerk of Court is directed to close document number 87 on the docket of this case.

SO ORDERED.

---

7. The Government also gave the Bates number of a spreadsheet produced to defendant outlining the additional prescriptions. Id.

8. The Court notes that the risk of unfair prejudice from this testimony is also minimal. The jury could not convict the defendant on a theory of guilt-by-association because the Court excluded testimony that Dr. Ahmad had been arrested or convicted, see Tr. 3:15–4:4, and also instructed the jury to be careful not to engage in guilt-by-association, id. at 972–973. The Court further instructed the jury that the jury could not convict defendant based on any alleged agreement between defendant and Dr. Ahmad. Id. at 972:19–24; see United States v. Memoli, 648 Fed.Appx. 91, 94 (2d Cir. 2016) (quoting United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002) (Rule 404(b) prejudice "can be cured with proper instructions, and juries are presumed to follow their instructions")).